Eleanor A. DuBay, OSB No. 073755
TOMASI SALYER MARTIN
121 SW Morrison St, Suite 1850
Portland, OR 97204
edubay@tomasilegal.com
Phone: (503) 894-9900
    Attorneys for Tasha Teherani-Ami


UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>15005 NW Cornell LLC; and<br>Vahan M. Dinihanian, Jr.,<br><br>      Debtors. | Bankruptcy Case Nos.:<br><br>19-31883-dwh11 (Lead Case)<br><br>19-31886-dwh-11<br><br>Jointly Administered Under<br>Case No. 19-31883-dwh11<br><br>SUPPLEMENTAL DECLARATION OF ELEANOR A. DUBAY IN SUPPORT OF CREDITOR TASHA TEHERANI-AMI'S MOTION TO DISMISS THE BANKRUPTCY CASES FOR CAUSE |

I, Eleanor A. DuBay, after being duly sworn, depose and say:

1.    I am an attorney at Tomasi Salyer Martin.  I represent Creditor, Tasha Teherani-Ami ("Creditor"), in the above-referenced action. I make this Declaration in support of Creditor Tasha Teherani-Ami's Motion to Dismiss the Bankruptcy Cases for Cause [158].

2.    This Declaration is based upon my personal knowledge of the facts set forth herein or a review of my firm's file and records related to these bankruptcy cases. In the ordinary course of its business, my firm regularly maintains litigation files which include copies

Page 1 – SUPPLEMENTAL DECLARATION OF ELEANOR A. DUBAY IN SUPPORT OF CREDITOR TASHA TEHERANI-AMI'S MOTION TO DISMISS THE BANKRUPTCY CASES FOR CAUSE
TEHERA-B1\00486713.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

of pleadings and briefing in cases in which it represents a party, correspondence, and other items such as court and deposition transcripts and copies of exhibits. I have personal knowledge of my firm's procedures for creating and maintaining pleadings files. If called upon to testify regarding the matters set forth herein, I could confidently do so.

3. On October 8, 2019, I attended and inquired at the BR 2004 Examination (the "2004 Exam") of Vahan M. Dinihanian, Jr. and 15005 NW Cornell (hereinafter, "Debtors"). Attached hereto as Exhibit 1 are copies of pages 1-3, 7-9, 12, 50-52, 66-70, 112-113, 136-137, 140, 157-160, 174-176, 180-184, 190-195, 220-221, 235-239, and 241 of Debtors' 2004 Exam transcript.

I HEREBY DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND THAT IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Dated: October 29, 2019.

TOMASI SALYER MARTIN


By: /s/ Eleanor A. DuBay_____
  Eleanor A. DuBay, OSB #073755
  (503) 894-9900
  edubay@tomasilegal.com
  Of Attorneys for Tasha Teherani-Ami

Page 2 – SUPPLEMENTAL DECLARATION OF ELEANOR A. DUBAY IN SUPPORT OF CREDITOR TASHA TEHERANI-AMI'S MOTION TO DISMISS THE BANKRUPTCY CASES FOR CAUSE
TEHERA-B1\00486713.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2019 I served a copy of the foregoing

**SUPPLEMENTAL DECLARATION OF ELEANOR A. DUBAY IN SUPPORT OF CREDITOR TASHA TEHERANI-AMI'S MOTION TO DISMISS THE BANKRUPTCY CASES FOR CAUSE** by electronic means using ECF to the parties listed below:

STEPHEN P ARNOT on behalf of U.S. Trustee US Trustee, Portland
steve.arnot@usdoj.gov

NICHOLAS J HENDERSON on behalf of Debtor Vahan M. Dinihanian, Jr. and Jointly Administered Debtor Vahan M. Dinihanian, Jr.
nhenderson@portlaw.com,
tsexton@portlaw.com;mperry@portlaw.com;hendersonnr86571@notify.bestcase.com

ELAYNA Z MATTHEWS on behalf of Creditor Columbia State Bank
elayna@sglaw.com, ktate@sglaw.com

BRUCE H ORR on behalf of Interested Party Tasha Teherani-Ami, in her capacity as the trustee of the Sonja Dinihanian GST Trust DTS 1/1/11
bho@wysekadish.com, tn@wysekadish.com;drw@wysekadish.com

ERICH M PAETSCH on behalf of Creditor Columbia State Bank
epaetsch@sglaw.com, ktate@sglaw.com

DOUGLAS R PAHL on behalf of Debtor 15005 NW Cornell LLC and Interested Party 15005 NW Cornell LLC
dpahl@perkinscoie.com, nlesage@perkinscoie.com;docketpor@perkinscoie.com

TROY SEXTON on behalf of Jointly Administered Debtor Vahan M. Dinihanian, Jr.
tsexton@portlaw.com, nhenderson@portlaw.com,mperry@portlaw.com,troy-sexton-4772@ecf.pacerpro.com

DANIEL L STEINBERG on behalf of Creditor Cornell Rd LLC and Creditor Lillian Logan
Daniel.Steinberg@jordanramis.com, Litparalegal@jordanramis.com

US Trustee, Portland
USTPRegion18.PL.ECF@usdoj.gov

and by first-class mail to the parties listed below:

| 15005 NW Cornell LLC | Vahan M. Dinihanian | Alexander LLC |
| 237 NW Skyline Blvd | 237 NW Skyline Blvd. | Attn: Alexander Logan |
| Portland, OR 97210-1053 | Portland, OR 97210-1053 | 19830 W Dixie Mt. Rd |
| | | North Plains OR 97133 |

CERTIFICATE OF SERVICE
TEHERA-B1\00486713.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Case 19-31883-dwh11    Doc 168    Filed 10/29/19

Attorney General of the US
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington DC 20530-0001

Bateman Seidel
c/o Gregory Miner
888 SW 5th Ave, Suite. 1250
Portland, OR 97204

Beaverton Chamber of
Commerce
412600 SW Cres St #160
Beaverton OR 97005

Christiana LLC
Attn: Christiana Logan
19830 W Dixie Mt. Rd
North Plains OR 97133

Dan Logan
19830 W Dixie Mt. Rd
North Plains OR 97133

Daniel Lorenz
521 SW Clay St.
Portland OR 97201

Gregory Miner
888 SW 5th Ave, Suite 1250
Portland OR 97204

Internal Revenue Service
Centralized Insolvency
Operations
PO Box 7346
Philadelphia PA 1910-7346

Office of the Attorney General
Oregon Department of Justice
1162 Court St NE
Salem OR 97301-4096

Oregon Dept. of Revenue
955 Center Street NE
Salem OR 97309-5018

Oregon Dept. of Consumer
& Business Services
350 Winter St NE 2nd Floor
Salem OR 97301

Oregon Secretary of State
Public Service Building
255 Capitol St NE, Suite 151
Salem OR 97310

Washington County
Dept of HHS - Code
Enforcement
155 N. First Ave, MS 5A
Hillsboro OR 97124

Washington County
Assessment & Taxation
155 N. First Ave
Hillsboro OR 97124

Oregon State Treasury
900 Court Street, Room 159
Salem OR 97301

Marlin Financial
300 Fellowship Rd.
Mount Laurel, NJ 08054

Thomas A. Bittner Schulte
Anderson, et al.
811 SW Naito Pkwy, Suite
500
Portland, OR 97204-3335

Multnomah County
Assessment, Recording &
Taxation
PO Box 2716
Portland, OR 97208-2716

Eagle Holdings LLC
237 NW Skyline Blvd.
Portland, OR 97210-1053

Envisiontec, Inc.
15162 S. Commerce Dr.
Dearborn, MI 48120

Cornell Rd LLC
Attn: Lillian Logan
19830 W Dixie Mt. Rd
North Plains OR 97133

Dated: October 29, 2019.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Eleanor A. DuBay, OSB #073755
    (503) 894-9900
    edubay@tomasilegal.com
    Of Attorneys for Tasha Teherani-Ami

CERTIFICATE OF SERVICE
TEHERA-B1\00486713.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Case 19-31883-dwh11    Doc 168    Filed 10/29/19

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

|   |   |   |
|---|---|---|
| In re: | ) | |
| | ) | |
| 15005 NW Cornell, LLC; and | ) | Bankruptcy Case |
| Vahan M. Dinihanian, Jr., | ) | Nos. 19-31883-dwh11(Lead |
| | ) | Case) |
| Debtors. | ) | |
| | ) | 19-31886-dwh11 |
| | ) | |
| | ) | Jointly |
| | ) | Administered under |
| | ) | Case No. |
| | ) | 19-31883-dwh11 |

DEPOSITION OF

VAHAN DINIHANIAN, JR.

Taken in behalf of Claimant

*   *   *

October 8, 2019

Two Centerpointe Drive, 6th Floor

Lake Oswego, OR 97035

Cynthia Marie Smith, CSR

Court Reporter

```
 1                    APPEARANCES:

 2   For the Debtor, Vahan Dinihanian, Jr.:

 3   MR. NICHOLAS HENDERSON
     Motschenbacher & Blattner, LLP
 4   117 S.W. Taylor Street
     Suite 300
 5   Portland, OR 97204-3029
     503.417.0500
 6   nhenderson@portlaw.com

 7   For the Debtor, 15005 NW Cornell, LLC:

 8   MR. DOUGLAS R. PAHL
     Perkins Coie
 9   1120 N.W. Couch Street
     10th Floor
10   Portland, OR 97209-4128
     503.727.2000
11   DPahl@perkinscoie.com

12   For the Claimant, Lillian Logan:

13   MR. RUSSELL D. GARRETT
     MR. DANIEL STEINBERG
14   Jordan Ramis
     Two Centerpointe Drive
15   6th Floor
     Lake Oswego, OR 97035
16   503.598.7070
     russell.garrett@jordanramis.com
17   daniel.steinberg@jordanramis.com

18
     For Tasha Teherani-Ami:
19
     MS. ELEANOR A. DUBAY
20   Tomasi Salyer Martin
     121 S.W. Morrison Street
21   Suite 1850
     Portland, OR 97204
22   503.894.9900
     Edubay@tomasilegal.com
23

24

25
```

1   For Sonja Dinihanian & Trust:

2   MR. BRUCE H. ORR
    Wyse Kadish, LLP
3   900 S.W. Fifth Avenue
    Suite 2000
4   Portland, OR, 97204
    503.517.8115
5   bho@wysekadish.com

6

7

8

9   Also Present:    Tasha Teherani-Ami,
    (Via telephone) Dan Logan, Alexander Logan
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    LAKE OSWEGO, OREGON; TUESDAY, OCTOBER 8, 2019

2                         9:16 a.m.

3                      *    *    *

4                 VAHAN DINIHANIAN, JR.

5    called as a witness in behalf of the Claimant,

6        having first been sworn by the Reporter,

7                 testifies as follows:

8            (Deposition Exhibits Numbers 1 through

9              11 marked for identification.)

10                     EXAMINATION

11   BY MR. GARRETT:

12       Q.   Good morning.  My name is Russ Garrett.

13   We met ahead of time.  Thanks for coming.  Can

14   you give us your complete name for the record

15   and your current residence address?

16       A.   Vahan Dinihanian, Jr.  237 N.W. Skyline

17   Boulevard, Portland 97210.

18       Q.   Okay.  So we're here today because of a

19   2004 exam order.  Are you familiar with what

20   that is?  Has anyone told you?

21       A.   No.

22       Q.   Have you ever had your deposition taken

23   before?

24       A.   Not -- no, not like this.

25       Q.   No.  All right.  Ever been involved in

1   any litigation before?

2       A.   No.

3       Q.   Have you ever had to give testimony

4   before?

5       A.   No.

6       Q.   In court or out of court?

7       A.   Not this.  I don't know what you're

8   referring to, but...

9       Q.   Have you ever been sworn in before?

10      A.   Yes.

11      Q.   And then after you were sworn in, asked

12  questions?

13      A.   Yes.

14      Q.   All right.  What was that -- describe

15  what that was about.

16      A.   I don't recall.  Various occasions.

17      Q.   So more than once?

18      A.   I don't recall.

19      Q.   You don't recall being sworn in and

20  testifying?  Or you don't recall what it was

21  related to?

22      A.   I don't recall what it was related to.

23      Q.   Okay.  But more than once?

24      A.   (Witness nods head.)  And just for the

25  record.  I want to identify that there's a

1    conflict of interest.  So all the people in this

2    room are witnesses to that.  One of the partners

3    of this office is Tim Ramis.  And he used to be

4    my attorney.

5        Q.    So back to my question.

6        A.    And you are able to hire an attorney of

7    your own and anything you say or do can and will

8    be used against you in a court of law.

9            MR. GARRETT:  So do we need to take a

10   break so you can talk to your client?

11           THE WITNESS:  I don't think we need to

12   take a break.  I'm just identifying some things.

13       Q.    (By Mr. Garrett)  Those were

14   nonresponsive to my question.  Can we go back to

15   my question?  So my last question was:  But more

16   than once?

17       A.    Repeat the question.

18       Q.    Do you want her to repeat the question

19   again?

20           (The Reporter read back as follows:

21            Question:  You don't recall being sworn

22            in and testifying or you don't recall

23            what it was related to?

24            Answer:  I don't recall what it was

25            related to.

1    Q.   All right.  How are you currently

2    employed?

3    A.   Self.

4    Q.   And as I've looked through the paperwork

5    that you filed with the court, looks like you

6    have a number of businesses.  So do you operate

7    all of those businesses by yourself?  Or do you

8    have some assistance?

9    A.   I operate them.

10   Q.   Do you have any employees?

11   A.   No.

12   Q.   So none of the business entities that we

13   see in the bankruptcy schedules have employees?

14   A.   Correct.

15   Q.   All right.  Do you employ any

16   professionals to assist you?

17   A.   Yes.

18   Q.   And which would those be?

19   A.   Dave Delap is my accountant.  Jenny

20   Rappe is my bookkeeper.  Those are the main two.

21   Q.   All right.  So is Dave Delap your

22   accountant for all of the businesses that you

23   have an interest in?

24   A.   Yes.

25   Q.   All right.  And how do you spell Jenny's

1    purchased or was it leased by you?

2          MR. PAHL:  Objection.  That calls for a

3    legal conclusion.

4      Q.   (By Mr. Garrett)  Or do you know?

5      A.   I don't recall.

6      Q.   Do you have a copy of the lease or

7    contract someplace?

8      A.   Someplace.

9      Q.   Any reason why it wasn't produced prior

10   to today?

11     A.   No.

12     Q.   You could have produced it you just

13   didn't?

14     A.   Correct.

15     Q.   All right.  Let me turn your attention

16   to Schedule I, which is your income.  I see

17   you're -- you list your occupation as

18   self-employed.  And on the next page you show

19   your net income from rental company and from

20   operating a business professional farm is

21   $4,500?

22     A.   Correct.

23     Q.   Is that a set amount every month?

24     A.   No.

25     Q.   All right.  And where do you get the

1    money from -- who pays you that?

2         A.    From the sale of farm products that we

3    grow on the farm.

4         Q.    So are you selling these yourself?  Or

5    is it one of the business entities that sells

6    it?

7         A.    Eagle Holdings sells it.

8         Q.    All right.  And then Eagle Holdings,

9    does it write you a check?

10        A.    No.

11        Q.    So where does the $4,500 come from?

12        A.    Cash sales.

13        Q.    And how do you -- how'd you come up with

14   $4,500 when you put this down here on Schedule

15   I?

16        A.    It's just from roadside sales of cut

17   flowers.  I planted two crops of cut flowers for

18   my daughter.  And she has helped me, pretty well

19   in the past, harvesting them and some sales.

20        Q.    So how often do you harvest the roadside

21   flowers?

22        A.    Different times of the year.  No set

23   time.

24        Q.    And what happens to the proceeds from

25   the sale of those roadside sales?

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 9 of 46

1      A.    It's just cash.  It's just used as cash

2  to buy groceries, and --

3      Q.    So you take the cash personally and then

4  use it to buy whatever you need by using the

5  cash?

6      A.    Correct.

7      Q.    All right.

8            MR. HENDERSON:  Can we take a break?

9            MR. GARRETT:  Yes.

10           (Recess from 10:24 a.m. to 10:30 a.m.)

11     Q.    (By Mr. Garrett)  Let me direct your

12  attention back to -- I think this is back on

13  Schedule D again.  D as in Delta.  2.2 is

14  Columbia State Bank.

15           MR. HENDERSON:  One more page.

16     Q.    (By Mr. Garrett)  There you go.  Do you

17  see that Columbia State Bank?

18     A.    Columbia State Bank.  Okay.

19     Q.    And the property that secures the claim

20  is listed as an Arburg model 420C injection

21  molding machine?

22     A.    Okay.

23     Q.    Do you see that?

24     A.    I do see that.

25     Q.    Is that the same --

1   what the market might be for any of these

2   vehicles?

3        A.   It's what I just said.  Depends on, you

4   know, the day and the economy and everything.

5        Q.   Right.  But you don't have any opinion,

6   yourself, though, of what these vehicles might

7   have been worth on any given day, do you?

8        A.   No.

9        Q.   You don't have any expertise in that

10  area; correct?

11       A.   I don't.

12       Q.   You wouldn't understand what the real

13  market value of any of these motorcycles would

14  be even if you looked at them in detail;

15  correct?

16       A.   Correct.

17       Q.   We would have to rely on someone else?

18       A.   That would be up to you.

19       Q.   So when you went to acquire these

20  vehicles, did you talk to someone about what the

21  values might be before you acquired them?

22       A.   No.

23       Q.   Where are they all located now?

24       A.   Um, 237 N.W. Skyline.

25       Q.   All right.  In the last two years have

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 11 of 46

1    you sold or transferred any motorcycles?

2        A.    I have.

3        Q.    You have?

4        A.    (Witness nods head.)

5        Q.    Which ones?

6        A.    I recently sold a couple of weeks ago

7    the 1930 Indian motorcycle.

8        Q.    How much did you sell it for?

9        A.    50,000.

10       Q.    How'd you come up with the value of

11   50,000?

12       A.    Um, it was what, um, the last one that

13   sold in the same condition that I knew of.

14       Q.    And what did you do with the proceeds?

15       A.    The proceeds were $12,000, I believe,

16   net out of that sale.  I bought the parts for

17   that, and made parts for it, and assembled the

18   complete machine.  And then it was worth more

19   than what I paid.  I probably had 38,000 in it.

20       Q.    So, but my question -- let me back up.

21   So you signed over the title to this 1930 Indian

22   motorcycle?

23       A.    Correct.

24       Q.    All right.  You signed your name to the

25   title because it was in your name?

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 12 of 46

1     A.   Correct.

2     Q.   And you received $50,000?

3     A.   Correct.

4     Q.   All right.  And in what form?  Check?

5   Money order?  Cashier check?

6     A.   Money order.

7     Q.   Made payable to who?

8     A.   Eagle Holdings.

9     Q.   Eagle Holdings, LLC?

10    A.   Correct.

11    Q.   And where did the check get deposited?

12    A.   Eagle Holdings.

13    Q.   All right.  And which account for Eagle

14  Holdings?

15    A.   I don't recall.

16    Q.   How many accounts are there?

17    A.   I think there's three now for Eagle

18  Holdings.

19    Q.   Do you recall which accounts they are?

20    A.   There's one at, um, at Northwest Bank,

21  another one at Umpqua Bank, and another one at

22  Columbia Credit Union.

23    Q.   How did you find the buyer for this

24  particular motorcycle?

25    A.   He came to me.

1      Q.    And how did he know to come to you?

2      A.    I sell parts at different shows

3    throughout the year.  And just by word of mouth

4    at the show.

5      Q.    So where did the transaction actually

6    occur?

7      A.    237 Skyline.

8      Q.    So it happened at your home?

9      A.    It happened at the business at the home.

10   All the buildings are business buildings.  It

11   was one of the buildings at the business.

12     Q.    And did you get a bill of sale?  Or is

13   there a bill of sale?

14     A.    I mean, I wrote the buyer a receipt.

15     Q.    Did you keep a copy?

16     A.    I did.

17     Q.    All right.  Was that 1930 Indian

18   motorcycle listed for sale any place?

19     A.    No.

20     Q.    Did you have that motorcycle shown on

21   any Website any place?

22     A.    No.

23     Q.    Do you know how the buyer knew that you

24   owned that motorcycle?

25     A.    Like I just told you it was at the show.

EXHIBIT 1
Page 14 of 46

1    Q.    Was the show at your home?

2    A.    No.

3    Q.    Where was the show?

4    A.    Tenino, Washington.

5    Q.    And do you know who the buyer was?

6    A.    I don't recall his name right now.

7    Q.    But do you have his name and contact

8    information someplace?

9    A.    I don't recall.

10   Q.    Is it possible you didn't retain his

11   name and contact information?

12   A.    It's possible.

13   Q.    If you did keep it where would you have

14   stored it?

15   A.    At the 237 N.W. Skyline building.

16   Q.    Which building?

17   A.    I don't recall.

18   Q.    All right.  Other than the 1930 Indian

19   motorcycle, have you sold or transferred any

20   other vehicles in the last two years?

21   A.    Not that I recall.

22   Q.    I mean, it's possible you have you just

23   can't recall sitting here today?

24   A.    Not that I recall.

25   Q.    If you had would you maintain records of

EXHIBIT 1
Page 15 of 46

1    adds up to 59,461.20.

2         A.    We'd have to get those exact figures for

3    you.

4         Q.    So sitting here today you don't know

5    what makes up the 59,461.20?

6         A.    It appears to be expenses.

7         Q.    That's what it says.

8         A.    Yeah.

9         Q.    My question is:  What expenses?

10         A.    Well, I think there's a list of expenses

11    here.

12         Q.    Well, which ones are you looking at that

13    adds up to that number?

14         A.    Well, for example, the hangar rent for

15    the helicopter, Aurora Meridian, is 6,000 --

16         Q.    I see that.

17         A.    -- per quarter.  I mean, per half of the

18    year.  It's 12,000 total for the year.  Like I

19    said we'd have to review that and get back to

20    you.

21              (Mr. Steinberg enters the room.)

22         Q.    (By Mr. Garrett)  Okay.  Let me -- I

23    went through your original schedules and we

24    covered those earlier as well, particularly

25    Exhibit Number 2 and I think Exhibit Number 3.

EXHIBIT 1
Page 16 of 46

1    But I didn't see any property up in Welches.

2    But you have an interest in property up in

3    Welches, don't you?

4        A.   Correct.

5        Q.   Why wasn't that listed?

6        A.   It should have been.  It should have

7    been listed as something that I own.

8        Q.   What's your -- do you know what your

9    relative interest is in that property?

10       A.   50 percent.

11       Q.   Okay.  And you own that personally?

12       A.   No.  I mean, it's owned with my sister.

13   My sister is a half partner.

14       Q.   And who's the other half partner?

15       A.   My sister and I are half partners in

16   that building.

17       Q.   When you reference yourself you mean you

18   personally, not one of your LLCs; correct?

19       A.   Correct.

20       Q.   All right.  It looks like you've got one

21   of the Columbia Bank -- Columbia State Bank

22   accounts relates to the Arburg?

23       A.   Arburg, yeah.

24       Q.   Okay.  That was a purchase that was made

25   by you?

1        Q.    So just a question on Exhibit 14 before

2   we leave it, why did you take so long to close

3   the Columbia Bank account?  And let me restate

4   it.  Why did you wait until the middle of August

5   to close the Columbia Bank account and transfer

6   to the debtor in possession account?

7        A.    It was a mistake.  I thought the only

8   one that I would need to close was the 4499

9   account at U.S. Bank.

10              (Deposition Exhibit Number 15 marked for

11               identification.)

12        Q.    (By Mr. Garrett)  So I've handed you

13   what we've marked as Exhibit 15.  Do you

14   recognize this account?

15        A.    Yes.

16        Q.    Is this the Eagle Holdings account?

17        A.    It is.

18        Q.    All right.  I also see that your name is

19   on it.  Is this a joint account between you and

20   Eagle Holdings, LLC?

21        A.    I mean my name is on Eagle Holdings

22   account, on this account, yes.

23        Q.    All right.  So this is a joint account?

24   Or do you know?

25        A.    I don't know.  They put my name on there

1   because I showed them the LLC documents for

2   Eagle Holdings, and my name as the manager.

3       Q.   But sitting here today you don't know

4   whether it's a joint account or not?

5       A.   I don't.

6       Q.   Okay.  I notice there's two deposits at

7   the end of August, August 29, totaling $50,000.

8   Do you know what that's from?

9       A.   That's that Indian that was sold, 1930

10  Indian.

11      Q.   All right.  And is there a reason why

12  this was not put into the debtor in possession

13  account?

14      A.   No.  The motorcycle was part of the

15  Eagle Holdings parts business, so...

16      Q.   Is that the reason?

17      A.   That's the reason.

18      Q.   Okay.

19           (Deposition Exhibit Number 16 marked for

20            identification.)

21      Q.   (By Mr. Garrett)  I've handed you what

22  has been marked Exhibit 16.  Are you familiar

23  with this?

24      A.   Looks familiar.

25      Q.   Have you seen this before?

1    do the work on the property?

2        A.    Correct.

3        Q.    So Eagle Holdings, LLC contracted with

4    Maywood -- with Norris & Stevens, Inc., to do

5    some maintenance work?

6        A.    There is no contract.  I just did --

7    Eagle Holdings does the maintenance.  They pay

8    Eagle Holdings rather than paying somebody else.

9    Somebody else was doing the maintenance until we

10   couldn't afford it any longer.  That's why.

11       Q.    So who actually goes over and does the

12   physical maintenance work?

13       A.    I do.

14       Q.    You do.  And how do you get paid?

15       A.    This is it.

16       Q.    Well, this went to Eagle Holdings, LLC?

17       A.    I sent them a bill.  I am Eagle

18   Holdings.  So I do the work and they send me the

19   money.

20       Q.    So Eagle Holdings, LLC are you both the

21   same thing as far as you're concerned?

22       A.    Yes.

23       Q.    MotoMinded, LLC.  I asked you about that

24   before.  What is MotoMinded, LLC?

25       A.    That's a customer of mine that buys a

EXHIBIT 1
Page 20 of 46

1      A.    Okay.

2      Q.    Okay.  Take a look at number 12.  We

3    didn't receive any of these documents either

4    pertaining to personal property with a value of

5    $500 or more.

6      A.    I don't have any of those documents.

7      Q.    So no bills of sale receipts,

8    appraisals, or insurance valuations, for any of

9    that?

10     A.    I don't have any of those documents.

11     Q.    Did you have any of those documents?

12     A.    I don't know.

13     Q.    Have you insured jewelry, artwork, or

14   guns, or rugs?

15     A.    No.

16     Q.    Let me ask you about Papa Pete's for a

17   minute.  When did you acquire that business?

18     A.    Papa Pete's.

19     Q.    Is that a business up in Washington?

20     A.    That's not my business.

21     Q.    Do you know what I'm referring to?

22     A.    I do.

23     Q.    Okay.  Do you know who owns it?

24     A.    I do.

25     Q.    Who owns it?

1        A.    A family named Coscia.

2        Q.    Okay.  And what's your relationship to

3    the property on which it sits?

4        A.    I own the property that they lease.

5        Q.    Okay.  When did you acquire that?

6        A.    I don't recall.  A long time ago.

7        Q.    Do you know what it's worth?

8        A.    I don't.

9        Q.    And is there --

10       A.    It might be worth zero.  Because I tried

11   to hire two Realtors.  One of them was Marcus &

12   Millichap.  And they said that it wasn't worth

13   anything because there's a tenant where the

14   lease is about to expire and nobody's going to

15   buy it.  I asked them if they could sell it for

16   me.  Didn't give them a price.  They pretty much

17   said forget it.

18       Q.    Your understanding the value of the

19   property itself is zero?

20       A.    I don't know if it's zero.  But they

21   said they wouldn't be able to sell it.

22   Investors are looking for properties with new

23   leases -- or not leases that are ready to

24   expire.  The lease expires next month.

25       Q.    All right.  And have you discussed

1    renewing or creating a new lease?

2        A.    They have an option to renew.  But we've

3    tried to contact them to see if they would tell

4    us early and they won't.

5        Q.    So they might renew or they might not;

6    right?

7        A.    That's still a possibility.

8        Q.    And if they don't renew, then what are

9    you going to do?

10       A.    I don't know.

11       Q.    Do you know what the tax assessed value

12   is for that property?

13       A.    I don't know, off the top of my head.

14       Q.    And which -- is there a specific entity

15   that owns that property?

16       A.    933 Harrison.

17       Q.    And when I looked at your original

18   schedules, and then your amended schedule, you

19   didn't put a value next to each of the LLCs or

20   the businesses.  Why is that?

21       A.    I don't know what they're worth.

22       Q.    Did you try to put a value on them?

23       A.    No.

24       Q.    You came up with a collective value of

25   20 million.  How did you arrive at that?

EXHIBIT 1
Page 23 of 46

1     A.    That's mostly my value of my half of

2    15005 Cornell.

3     Q.    What about the rest?

4     A.    It would have some kind of a net value

5    after all the taxes are paid.  Like I said

6    before, the federal and state tax has to be

7    paid, the 1031 benefits have to be given back,

8    the real estate commissions have to be paid.

9    There would be -- there would be a small net

10   leftover.

11    Q.    But you haven't done that analysis yet;

12   is that right?

13    A.    No.

14    Q.    Would you do that analysis?  Or would

15   you have someone else do that analysis?

16    A.    I wouldn't do it.  It's not part of my

17   plan.  That's my business.  That's the way that

18   I parent my daughter, and I run my business.

19   And that's my livelihood.

20    Q.    That's not my question.

21    A.    Get rid of that and I don't survive,

22   so...

23    Q.    My question is:  Is that analysis that

24   you would do?  Or is that analysis that you

25   would have someone else do if you were going to

EXHIBIT 1
Page 24 of 46

1  the property at the time of the dissolution?

2      A.    I wouldn't know what the value of it

3  would be.  You'd have to actually talk to people

4  that may buy it.  And you would have to give

5  them the problems with the property and then see

6  what they would say.  And I told that to this

7  appraiser but I never saw this appraisal.

8      Q.    So you never saw the finished product?

9      A.    Right.

10     Q.    So on the Skyline property I think

11 you've mentioned that there are multiple

12 buildings other than the personal residence that

13 you live in?

14     A.    Correct.

15     Q.    What are those other buildings?

16     A.    Shops.

17     Q.    Is there another single-family dwelling

18 unit on the property?

19     A.    The original little house that was on

20 the property.  Yes, it's there.

21     Q.    Does anybody live in that property?

22     A.    Yes.

23     Q.    Are they tenants?

24     A.    Yes.

25     Q.    Is there a written rental agreement?

1    A.    Yes.

2    Q.    Do you have a copy of that written

3  rental agreement?

4    A.    No.

5    Q.    How much do those tenants pay per month?

6    A.    Approximately $1,000 apiece.

7    Q.    And what do you mean by apiece?

8    A.    Huh?

9    Q.    What do you mean by apiece?  $1,000

10  apiece?

11    A.    Each tenant pays $1,000.

12    Q.    How many tenants do you have?

13    A.    Three.

14    Q.    And was that information included in

15  your bankruptcy schedules?

16    A.    No.

17    Q.    Who are the tenants?  Their names?

18    A.    Names of the tenants?  I don't have

19  their names, right off the top of my head.  We

20  discussed this before, and it's -- it could

21  be --

22         MR. HENDERSON:  Well, either you know

23  the answer to her question or you don't.

24         THE WITNESS:  Yeah, I don't.

25    Q.    (By Ms. DuBay)  Would you be able to

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 26 of 46

1    find out that information?

2        A.    Yes.

3        Q.    And where would that information be

4    located?

5        A.    237 at Eagle Holdings' office.

6        Q.    So you mentioned earlier that Eagle

7    Holdings also rents some of the buildings?

8        A.    Just that one.

9        Q.    What's that one?

10       A.    The one you just asked about.

11       Q.    So Eagle Holdings rents the

12   single-family dwelling unit?

13       A.    Correct.

14       Q.    So the money that the tenants are paying

15   for that single-family unit goes to Eagle

16   Holdings?

17       A.    Into Eagle Holdings.  That's correct.

18       Q.    Do you know what account that money is

19   deposited into?

20       A.    Two of them.  Well, all three of them go

21   into Eagle Holdings' PayPal account now.

22       Q.    Does Eagle Holdings have an ownership

23   interest in 237 Skyline?

24       A.    It does, yes.

25       Q.    And do you have a document showing Eagle

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 27 of 46

1      A.    Correct.

2      Q.    And is that paid in one lump sum, or do

3    you make payments?

4      A.    I usually pay it in one lump sum.

5      Q.    And has this particular tax year been

6    paid yet?

7      A.    No.

8      Q.    Are there personal property taxes for

9    Skyline?

10     A.    No.

11     Q.    Are there any other assessments or city

12   charges from the City of Portland or maybe a

13   water bureau?

14     A.    The water would be from the City, yeah.

15     Q.    Are there any other city assessments

16   that the property is charged?

17     A.    Not that I can think of.

18     Q.    So moving on to the Cornell Road

19   property, have you attempted to refinance that

20   property?

21     A.    To try to refinance the what?  What was

22   the question?

23     Q.    Have you attempted to refinance the

24   Cornell Road property to pay the judgment lien

25   that's on the property?

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 28 of 46

1    A.    Have I tried to refinance?  I tried to

2    get financing by using my interest in that

3    property, yes.

4    Q.    When did you attempt to get financing?

5    A.    Oh, it's been for several years now.

6    Q.    Do you recall roughly an exact date?

7    A.    I don't know the exact date.

8    Q.    Did you submit a loan application?

9    A.    No.  I just talked to several people

10   that said that, um -- no, I didn't.

11   Q.    Do you remember who you talked to about

12   financing that property?

13   A.    Not off the top of my head.  We've

14   talked to a lot of people.  They won't finance

15   it because they can't get a partition.  And I

16   need a partition line, or I need an agreement

17   from my sister to be okay with using my half as

18   collateral to get the loan to pay it off.  She

19   won't do it.  And they won't partition it.  So

20   pretty much impossible.

21   Q.    And do you recall who you had those

22   conversations with?

23   A.    Conversations with regard to, um,

24   financing the property?

25   Q.    Yes.

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 29 of 46

1    A.    Yeah.

2    Q.    And who were those people?

3          MR. HENDERSON:  Well, I would say you

4    can answer other than don't talk about

5    discussions with your attorneys.  But other than

6    that you're free to answer.

7          THE WITNESS:  Well, the most recent one

8    is this Mr. Brenneke.  Um...

9    Q.    (By Ms. DuBay) Would that be Paul

10   Brenneke?

11   A.    Correct.

12   Q.    And so you've talked to Mr. Brenneke

13   about getting a loan secured by the Cornell Road

14   property?

15   A.    Correct.

16   Q.    And but you haven't submitted an actual

17   application for a loan?

18   A.    Correct.

19   Q.    When did you have those conversations

20   with Mr. Brenneke?

21   A.    Last week.

22   Q.    Are you attempting to obtain financing

23   for the Cornell property now?

24   A.    I would like to do that, yeah.  Yes.

25   Q.    What would the purpose of that financing

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 30 of 46

1    be?

2        A.   To go forward with the platting and

3    subdivision of lots.  And it's 1031ing packages

4    of lots into a property that I could obtain a

5    loan to then pay off the debt at hand.  That

6    would be the -- that's the plan.

7        Q.   So you would not use that financing to

8    just pay off the debt?

9        A.   No.

10       Q.   So --

11       A.   I mean, I -- it's still a possibility.

12   We're still working through the details.  Sorry.

13       Q.   Other than over the last week have you

14   talked to Mr. Brenneke or any other person

15   before that about financing the property?

16       A.   Yes, I said that I did.  You asked that

17   before.  And I can't recall who it all was.

18       Q.   Okay.  And how much money have you and

19   Mr. Brenneke discussed the financing to be for?

20       A.   I don't recall the exact number that it

21   will end up at.

22       Q.   Have you had any discussions about a

23   ballpark number with him?

24       A.   It's still being negotiated.

25       Q.   Have you submitted any documentation to

1   Mr. Brenneke for this financing?

2       A.   No.

3       Q.   Has he asked for any documentation?

4       A.   No.

5       Q.   Have you obtained an appraisal for the

6   property for this financing?

7       A.   No.

8       Q.   Do you plan to obtain an appraisal for

9   the property?

10      A.   Not at this time.

11      Q.   Have you ever had an appraisal -- or

12  other broker's price opinion, other evaluations?

13      A.   No.  We think we pretty much know

14  ourselves.  We're familiar with land values and

15  what the value of it is today and then what the

16  value of it is after the entitlement.  It's not

17  entitled.  So it's got a higher value when it's

18  entitled.

19      Q.   So the valuation that you listed in your

20  schedules is that based on the valuation with or

21  without entitlements?

22      A.   Without.

23      Q.   And what's the valuation with

24  entitlements?

25      A.   We think that it could be twice as much

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 32 of 46

1    expenses of garbage, gas, water, sewer, things

2    like that are paid for by Eagle Holdings.  The

3    rent from the rental house goes into Eagle

4    Holdings.  Sorry it was omitted.  We can put it

5    on there.

6         Q.   So have you reviewed these?

7         A.   I have.

8         Q.   Have you reviewed them for accuracy?

9         A.   Yes.

10        Q.   So looking at page 2 of Exhibit 9, we're

11   looking at the liabilities and equity section.

12   And nowhere in the liability section is the

13   judgment that you owe to Ms. Teherani-Ami; is

14   that correct?

15        A.   Okay.  No.

16        Q.   Is that a liability that you personally

17   owe?

18        A.   Yes.

19        Q.   And is there any reason that it would be

20   omitted from your balance sheet?

21        A.   No.

22             (Deposition Exhibit Number 26 marked for

23              identification.)

24        Q.   (By Ms. DuBay)  All right.  So you've

25   been handed Exhibit 26, which is a Northwest

1    Bank loan billing statement; is that correct?

2        A.    Okay.

3        Q.    And it looks like it's sent to 933

4    Harrison Avenue, Centralia, LLC.

5        A.    Okay.

6        Q.    Is that accurate?

7        A.    Yes.

8        Q.    And I think you testified earlier that

9    this is the LLC that's related to the Papa

10   Pete's Pizza property?

11       A.    Yes.

12       Q.    And is this the loan related to that

13   property?

14       A.    Yes.

15       Q.    And is that property -- is that a

16   commercial or residential property?

17       A.    Commercial.

18       Q.    Is there any other tenant besides Papa

19   Pete's?

20       A.    No.

21       Q.    Is that property currently listed for

22   sale?

23       A.    No.

24       Q.    How much rent does Papa Pete's pay?

25       A.    10,000 a month.

1    Q.    And do you have a written lease

2    agreement with Papa Pete's?

3    A.    Yes.

4    Q.    And where would a copy of that document

5    be located?

6    A.    Eagle Holdings 237.

7    Q.    And what account are the rents deposited

8    into?

9    A.    I believe that one goes into Northwest

10   Bank, Eagle Holdings' account.

11   Q.    Is that account ending 3422?

12   A.    I don't know what the number of it is.

13   Q.    Looking at this loan statement it says,

14   down toward the bottom, the payment due will be

15   charged to checking account 3422.  Do you know

16   what checking account that refers to?

17   A.    That must be the Eagle Holdings account

18   at Northwest Bank.  Okay.  I don't have all my

19   account numbers memorized.

20   Q.    So Eagle Holdings is paying that loan

21   for Papa Pete's?

22   A.    That's correct.  The loan money comes

23   into Eagle Holdings' account and they

24   automatically pay it every month.

25   Q.    And then a little bit further up it says

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 35 of 46

1   collateral, slash, property first DOT on

2   property located at 939 Harrison Avenue.  Do you

3   see that?

4        A.   Collateral...

5        Q.   It's in the loan summary section.

6        A.   Loan summary section.

7             MR. HENDERSON:  First line.  This one

8   here.

9             THE WITNESS:  Oh, okay.  Collateral.

10  First on property located 93...  Well, the

11  property has a weird address.  It's actually got

12  two addresses.  The city of Centralia screwed up

13  when they surveyed the property.  But they go by

14  933 Harrison.

15       Q.   (By Ms. DuBay)  And that's the address

16  that has the Papa Pete's in it?

17       A.   There's only one address there.  There's

18  not two.

19       Q.   Northwest Bank has the first Deed of

20  Trust on that property securing this loan?

21       A.   Yes.

22       Q.   Is there anything else that secures this

23  loan?

24       A.   No.

25       Q.   Do you have a personal guarantee to

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11   Doc 168   Filed 10/29/19

EXHIBIT 1
Page 36 of 46

1    secure this loan?

2        A.    I don't know.

3        Q.    Do you have any document that would show

4    if you had a personal guarantee on this loan?

5        A.    The loan documents I would say would

6    show.

7        Q.    Do you maintain copies of those loan

8    documents?

9        A.    Yes.

10       Q.    And where are those documents?

11       A.    237.

12       Q.    So the same section, loan summary, it's

13   got a maturity date of 3/1/2020; is that

14   correct?

15       A.    That's correct.

16       Q.    And has this loan matured in the past?

17       A.    It has.

18       Q.    And have you gotten extensions for this

19   loan?

20       A.    We have.

21       Q.    Have you had to provide any additional

22   collateral or down payments to receive those

23   extensions?

24       A.    No.

25       Q.    When was the last time you executed an

1    extension of this loan?

2        A.    I don't recall.

3        Q.    Is there any other real property that

4    secures this loan besides the 933?

5        A.    No.

6              (Deposition Exhibit Number 27 marked for

7                identification.)

8        Q.    (By Ms. DuBay)  Twenty-Seven.  So take

9    your time and look through Exhibit 27.  It's a

10   set of statement of accounts from Columbia

11   Credit Union.

12       A.    Okay.

13       Q.    So it appears that this is an account in

14   the name of Eagle Holdings, LLC?

15       A.    Okay.  Yes.

16       Q.    And on the first page, it says there is

17   an external deposit from Northwest Bank in the

18   amount of $238,000 and change; is that correct?

19       A.    Correct.

20       Q.    What was that money from?

21       A.    I sold the stock that I owned in

22   Northwest Bank in order to pay bills.

23       Q.    And that was done in March of 2019?

24       A.    I don't recall.

25       Q.    This statement period is from March 1,

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554
Case 19-31883-dwh11    Doc 168    Filed 10/29/19

EXHIBIT 1
Page 38 of 46

1    Q.    And you testified earlier that you're

2    providing the maintenance directly?

3    A.    Yes.

4    Q.    And that's what these payments are for?

5    A.    That's correct.

6    Q.    What are superintendent's expenses?

7    A.    Things like changing ballast, electrical

8    ballast, and maybe a door repair or something

9    like that.

10    Q.    And are you still performing those

11    services today?

12    A.    Yes.

13    Q.    And so are you still receiving income?

14    A.    Yes.

15    Q.    And do you know about how much a month

16    you're receiving for doing that?

17    A.    It's different every month.

18    Q.    And you said -- I think you said you

19    send invoices to Norris & Stevens for that?

20    A.    I do.

21    Q.    So you testified earlier about the $4500

22    monthly income that's listed in your schedules.

23    And that's based on a roadside floral sales?

24    A.    That was for the year.

25    Q.    So --

1    A.    That's what I testified was that that

2    was for the year.

3    Q.    So your income statement it, does not

4    include the income that you would receive from

5    the Maywood Professional Plaza services?

6    A.    Oh, I don't know.

7          (Deposition Exhibit Number 37 marked for

8              identification.)

9    Q.    (By Ms. DuBay)  This is Exhibit 37.  It

10   appears to be statements from a Charles Schwab

11   account; is that correct?

12   A.    Correct.

13   Q.    And it says it's a custodial account and

14   it's got your name.  And then looks like it

15   might say custodian for Sonia Dinihanian?

16   A.    Correct.  I opened it up for her.

17   Q.    So this is an account that you manage on

18   behalf of your daughter?

19   A.    Correct.

20   Q.    So looking at the first statement, which

21   is for January 20 -- January of 2018, on page 3

22   it says that the ending value on 1/31/18 was for

23   this period $43,000, almost 44.  Is that

24   accurate?

25   A.    Correct.

1    judgment?

2        A.    No.    The best possible scenario would be

3    to dispose of the Cornell Road property to pay

4    that off either through a partition or sell it

5    as a whole.

6        Q.    So I think you testified earlier that

7    you aren't sure if you're disputing the

8    judgment; is that correct?

9        A.    Correct.

10        Q.    So did you file these bankruptcy cases

11    to avoid paying the judgment balance?

12        A.    We were out of time.    And your client

13    was demanding the entire payment and not going

14    to take a part payment.    So there had to be more

15    time.    And the bankruptcy was protection to give

16    us more time.

17            The Judge Hunsaker in Washington County

18    went against -- ruled against the statute of the

19    state of Oregon.    And I later found out that her

20    judgment -- her ruling was not a legal ruling.

21    And if she was appealed that she would lose that

22    ruling.    So we needed more time so we're still

23    going through that process.

24        Q.    So do you plan to appeal that ruling

25    from Judge Hunsaker?

1    A.    That's up in the air.  We'll have to see

2    what my counsel decides to do.

3    Q.    So you were talking about you needed

4    more time.  Are you referring to the nonjudicial

5    foreclosures of the two, the Skyline and the

6    Cornell Road property?

7    A.    Correct.

8    Q.    And were those two nonjudicial

9    foreclosure sales scheduled in June of this

10   year?

11   A.    Is that when they were?  Okay.

12   Q.    Well, did you file --

13   A.    Yeah, okay.  I don't -- I don't have all

14   the dates memorized.  But we ran out of time, so

15   we filed to get the time that we need to work

16   this out, and restructure and go forward.

17   Q.    So you filed the bankruptcy cases to

18   stop the two nonjudicial foreclosures?

19   A.    Correct.

20   Q.    And these cases were both filed

21   simultaneously on May 21st of this year; is that

22   correct?

23   A.    I don't remember the exact simultaneous

24   time or date of the filing.

25   Q.    Well, did you file these cases on May

1   21st because there was a contempt proceeding

2   against you on May 22nd?

3      A.   I don't remember the exact date, but

4   they were filed.

5      Q.   Well, do you recall that there was a

6   hearing scheduled in the dissolution case in

7   May?  Do you --

8      A.   Filed the dissolution.  I don't

9   remember.

10     Q.   That there was a contempt proceeding

11  against you in that case?

12     A.   Okay.  I remember something about that.

13     Q.   Did you file these cases to stop that

14  contempt proceeding against you?

15     A.   I filed because we needed more time to

16  work through a process to complete this process.

17     Q.   So by time you mean also stopping the

18  contempt proceeding?

19     A.   If it stops the contempt proceeding, it

20  stops the contempt.  But we needed more time

21  because your client wouldn't take a part

22  payment.  And so we're going to take the time

23  now to work through this.  I have a plan.  And

24  we're not going to -- all the questioning that

25  you did about all the accounts or anything

1    doesn't mean anything because it's not going to

2    be used.  I don't agree to use it.  The

3    motorcycles or whatever you want, the trucks and

4    cars that's all great.

5         MR. HENDERSON:  I think you've answered

6    her question.

7         THE WITNESS:  Okay.

8         Q.  (By Ms. DuBay)  So for your proposed

9    plan I think it's been said before that the

10   objective of the proposed plan is going to --

11   excuse me, is going to be to continue the

12   partition litigation on the Cornell property; is

13   that correct?

14        A.  That's one --

15        MR. HENDERSON:  One second.  To the

16   extent it does not involve discussion with your

17   attorneys you can answer.

18        THE WITNESS:  That may be one

19   possibility.  We're not sure about the partition

20   action.  Like I said, it was -- the judge ruled

21   against the Oregon statute of partitioning kind.

22   So we feel that that's -- I feel that that's

23   pretty severe.

24        Q.  (By Ms. DuBay)  So how will the proposed

25   plan propose to pay the judgment in full?

1       A.    That's up in the air.  We haven't gotten

2   to that point.

3       Q.    And how would the plan treat

4   Ms. Teherani-Ami if she is an impaired unsecured

5   creditor?

6       A.    How would it treat her?  I don't know.

7       Q.    Did you plan to file the adversary

8   complaint related to the Cornell Deed of Trust

9   when you filed these bankruptcy cases?

10      A.    The adversary complaint.  What was that

11  now?

12      Q.    Did you plan to file -- the adversary

13  complaint alleging that the Cornell Deed of

14  Trust was fraudulently transferred, did you plan

15  to file that when these cases were filed in May?

16      A.    I don't recall.

17      Q.    How will the plan propose to pay the

18  expenses of the partition case?

19      A.    We haven't gotten to that point yet.

20      Q.    And how do you plan to pay for the

21  lawyers for the partition case?

22      A.    Um, we haven't arrived at that

23  conclusion as well.

24      Q.    Okay.

25            MS. DUBAY:  I think I'm -- off the

1                 C E R T I F I C A T E

2

3

4           I, Cynthia Marie Smith, a Notary Public

5    for Oregon, do hereby certify that, pursuant to

6    stipulation of counsel for the respective

7    parties hereinbefore set forth, VAHAN

8    DINIHANIAN, JR. Personally appeared before me at

9    the time and place set forth in the caption

10   hereof; that at said time and place I reported

11   in Stenotype all testimony adduced and other

12   oral proceedings had in the foregoing matter;

13   that thereafter my notes were reduced to

14   typewriting under my direction; and that the

15   foregoing transcript, pages 1 to 241, both

16   inclusive, constitutes a full, true and accurate

17   record of all such testimony adduced and oral

18   proceedings had, and of the whole thereof.

19           Witness my hand and CSR stamp at

20   Vancouver, Washington, this 27th day of October,

21   2019.

22

23   _____
     CYNTHIA MARIE SMITH
24   Notary Public for Oregon,
     Residing at Vancouver, Washington.
25   My Commission Expires:  9/27/21